[Civ. No. 17. Fourth Appellate District.—October 29, 1929.]

CECIL H. REEVES, Appellant, v. D. L. TAYLOR, Respondent.

Nichols, Cooper & Hickson and Bert L. Cooper for Appellant.

Isaac Jones for Respondent.

BARNARD, J.—This is an action by a broker for the recovery of a commission for the sale of an orange grove, claimed to have been made by plaintiff and one L. L. Hammersley, a salesman in his employ. On March 6, 1926, the defendant executed and delivered to plaintiff a written listing agreement. On April 19th, the said Hammersley, acting for plaintiff, secured from defendant what was apparently a written option, in connection with a deal he then

had on with a man named Thompson, permitting him to sell the place listed to Thompson for $16,000. On the morning of April 20th or 21st plaintiff met one Edward Kranz and his father at an orange grove owned by Kranz and situated across two ten-acre tracts from defendant's grove, the sale of which is in controversy. This meeting was for the purpose of considering the sale of another orange grove owned by plaintiff and which he was trying to sell to the said Kranz. Kranz obtained his first information concerning defendant's grove through this conversation, the extent of this information being in dispute. At this same conversation Kranz stated to plaintiff that he had certain equities in certain properties in Altadena, which he would like to trade in on some orange grove. Shortly before the conversation ended the said Hammersley appeared on the scene, which will be later referred to. Later that morning Kranz and his father drove by defendant's grove, and the father advised the son to purchase the same if he could get it.

In the afternoon of the same day plaintiff and Hammersley went to Altadena, examined the properties proposed to be used in trade by Kranz and then called on Kranz, where another conversation occurred. It further appears that about May 18th Kranz ascertained from a neighboring packing-house the name of defendant, which had not been given him by plaintiff, and called at defendant's home. Defendant was not there but his wife stated that she thought the property was not for sale, and Kranz left word to write him in the event they desired to sell. The following day, having received a postal card, he again called. The next succeeding day, which was May 20th, a purported agreement of purchase and sale between defendant and Ida E. Kranz, mother of Edward Kranz, was executed and put in escrow in a bank. Shortly thereafter the said Hammersley called at defendant's home, in connection with the Thompson deal above mentioned, which he states he still hoped to put through. While there he stated to defendant's wife that he had another deal in mind, with some trade in it. Mrs. Taylor told him he was too late, that they had already sold, giving him the name of the purchaser, and he replied: "That lets us out; I am sorry we couldn't make the deal, this other deal . . . but

I am glad you sold the grove.'' The other deal just referred to was apparently the Thompson deal on which he had called.

Two or three days later both agents came out and claimed to have been instrumental in making the sale. Defendant, having been told by Kranz in the first instance that no agent was connected with the sale, then notified Kranz that he would not sell unless Kranz paid the commission. Later, by consent of both parties, the bank returned the deposit and the deal was dropped. It appears that defendant had purchased the property involved on contract the preceding December from a man named Stewart, paying only about $300 down, although Stewart received part of the proceeds of the crop picked that spring. After abandoning the Kranz deal defendant threw up his contract with Stewart, receiving nothing for his equity in the place. He did not convey any equity to Stewart or to anyone, and did not suggest that Kranz deal directly with Stewart. However, some time in September, or later, Stewart conveyed the property involved to Kranz. The listing agreement above referred to contained the following provisions:

'' . . . I hereby empower and appoint you my agent for a period of 60 days from this date, and thereafter until further notice from me in writing.

'' . . . Should a deal be made through your efforts or assistance, or by me to any person or persons who become interested in said property through your efforts, I agree to pay you for your services a commission as per schedule below. Any change in price or terms which I may accept shall not affect your agency or rate of commission. Should this property not be sold, but is shown or described to a prospective purchaser by said agents prior to the termination of this listing and I subsequently sell or convey said property to such prospective purchaser within ninety days from the termination of this listing, then I agree to pay said agents the full commission for such sale. I agree to furnish a good and sufficient deed and a satisfactory certificate of title.''

No notice in writing terminating the agency was ever given.

Plaintiff filed suit for commission and this appeal is from a judgment in favor of defendant. ■ Appellant con-

tends that a finding by the trial court, to the effect that no sale or contract of sale was made through the efforts of the plaintiff or his salesman is not supported by the evidence. He insists that the place was sold through his efforts, and to one to whom he had described it. While it might appear that such sale as was made was made through plaintiff's efforts, if we accept his evidence in its entirety, there is a sharp conflict in the evidence in its most important phases, namely, as to what was said in the two conversations above mentioned, the only times the agents talked to the alleged purchaser. In the first conversation, in the morning, plaintiff says he told Kranz he thought he had another piece of property which would suit him, and that he gave him the location, described the property and offered to take him to see it, but that Kranz preferred to drive his own car and agreed to investigate the place. He also states that at this time Kranz suggested turning in the equities on the Altadena properties on the purchase price of defendant's place, and that on the same afternoon at Altadena, after investigating the properties offered, he told Kranz that these would not be acceptable to defendant, but that this must be a cash deal; and that after again telling him all about defendant's grove, Kranz agreed to go and investigate it the following Monday. Hammersley testified that during this talk at Altadena he told Kranz he thought he could deliver defendant's place to him for $16,000.

On the other hand, Kranz testified that at this first conversation in the morning the talk was entirely on the grove belonging to plaintiff, which he desired to sell to Kranz; that during the conversation plaintiff mentioned that he thought he had another piece of property that would suit Kranz, which he stated he could not deliver; that he told him where the grove was but not the name of the owner. Kranz denies that anything was said to him that afternoon at Altadena by either of the agents about the defendant's property; and says the only mention of the Altadena equities which he desired to trade was the fact that he would like to trade them on some orange grove. The evidence of Kranz is somewhat confirmed by the evidence of Hammersley, that he accidentally dropped in at the first conversation referred to because he was out there to see if the above-named Thompson was in the vicinity, looking at defendant's

grove. He further states that he fully expected to close the deal with Thompson that very day. It will be recalled that only a day or two before he had secured a written option for this purpose. The fact that the suggestion of trading in certain equities was made while plaintiff was attempting to sell his own land, and that plaintiff immediately went to Altadena to investigate the same, under the circumstances just narrated, confirms the statement of Kranz that these equities were not mentioned in connection with defendant's place. A further suspicious circumstance is that Hammersley states that during the talk at Altadena he told Kranz he thought he could deliver defendant's place to him for $16,000, and yet Kranz, with no effort to look into this, went ahead to deal direct with the owner and agreed to pay $17,000. The usual motive for going around an agent and dealing with the owner is to get the land at a lower price.

It will be noted that the purported agreement between defendant and Kranz was made on May 20, 1926, about a month after plaintiff alleges he interested Kranz in the deal. It is undisputed that neither plaintiff nor his salesman said anything to Kranz after the first day; that nothing was said to defendant until after the purported sale to Kranz; and that no effort was made to ascertain why Kranz did not come out to investigate the place, as they claim he agreed to do. The court was justified in believing the portion of the evidence which indicates that both of these conversations between the agents and Kranz were had in connection with the plaintiff's effort to sell his own land, and that no effort was made to interest Kranz in the property of defendant. It is a reasonable inference that at that time the agents believed defendant's place to have been practically sold to Thompson; that they therefore told Kranz in effect that the place was not on the market, and made no effort to describe it to him or to interest him in it; that Kranz did not become interested in defendant's property through any effort of the agents; and that the parties were not brought together or a binding contract secured through their efforts. The rights of the parties were fixed by the special conditions of this listing agreement. Nothing more is here presented than a conflict in the evidence, which the trial court has resolved in favor of the defendant.

592

A further consideration is that plaintiff relies on the purported agreement of May 20th between defendant and Ida Kranz, as being a binding and enforceable agreement, and therefore giving him a right to a commission under the well-known rules of law. So far as it appears from the evidence, under its own terms, this contract could not have been enforced, and was therefore not sufficient to entitle plaintiff to a commission. The contract contained this clause:

"This escrow is contingent upon successful completion of escrow between A. B. Stewart and seller herein."

The evidence is uncontradicted that defendant owed Stewart more than he was getting out of this escrow, and that Stewart objected to accepting a new owner. There is no evidence that Stewart ever gave his consent, or that the contingent escrow mentioned was ever completed. For the reasons given the judgment is affirmed.

Marks, J., and Sloane, P. J., concurred.